### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 22-cr-76(1) (KMM/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Shevirio Kavirion Childs-Young, | |
| Defendant. | |

Andrew M. Luger, United States Attorney, and Craig R. Baune and Thomas Calhoun-Lopez, Assistant United States Attorneys, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Douglas L. Micko, Assistant Federal Defender, and Manvir K. Atwal, First Assistant Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant).

### I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Shevirio Kavirion Childs-Young's Motion to Suppress Eyewitness Identifications, ECF No. 89, and Motions to Suppress Evidence Obtained as a Result of Search and Seizure, ECF Nos. 91 through 94.[1] This motion has been referred to the undersigned for a report and recommendation to the district court, the Honorable

---

[1] Defendant has withdrawn his Motion to Suppress Statements, Admissions, and Answers, ECF No. 90. ECF No. 108 at 1; Tr. 9:18-10:3, ECF No. 117. Accordingly, the Clerk of Court will be directed to term it. In addition, the Court notes it cites to the redacted transcript of the motions hearing, which remains under temporary seal in connection with the process for redacting any personal identifiers. *See generally* D. Minn. LR 5.5; ECF No. 117; *see also* ECF Nos. 115, 116 (addressing redaction of personal identifiers).

Katherine M. Menendez, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on November 8, 2022. ECF No. 108. Thomas Calhoun-Lopez appeared on behalf of the United States of America (the "Government"). Douglas L. Micko and Manvir K. Atwal appeared on behalf of Defendant. Post-hearing briefing is now complete, and this motion is ripe for a determination by the Court.

## II. FINDINGS

The Court heard testimony from Sergeant David Ligneel of the Minneapolis Police Department. The Government offered and the Court received Exhibit 1, the Minneapolis Police Department Sequential Line-Up Photo Identification Form and the six photos used in the line-up identification conducted in this matter on February 18, 2022; Exhibit 2, an audio recording of the interview and photo line-up Sergeant Ligneel conducted on February 18; Exhibit 3, the warrant and supporting materials to obtain a biological sample from Defendant for DNA analysis ("DNA Warrant"); Exhibit 4, the warrant and supporting materials to obtain information regarding a specified Cash App account ("Cash App Warrant"); Exhibit 5, the warrant and supporting materials for data and records relating to a specified cellular telephone number ("Cell Phone Warrant"); and Exhibit 6, the warrant and supporting materials to search a residence located on Sixth Street North in Minneapolis, Minnesota ("House Warrant").

Based upon the file and documents contained therein, along with the testimony and exhibits presented, the undersigned Magistrate Judge makes the following findings.

**A.  Carjacking & Robbery of L.D.W.**

Sergeant Ligneel has been a member of law enforcement for just under 30 years, and a sergeant with the robbery unit of the Minneapolis Police Department for "[o]ver a year and a half."  Tr. 21:22-22:13; *see also* Tr. 47:11-12.  He is also a task force officer with the FBI's violent-crimes task force.  Tr. 22:23-25.

Sergeant Ligneel participated in the investigation of a ride-share carjacking and robbery that occurred in or around September 2021.  Tr. 23:21-23, 39:23-40:6.  L.D.W., who was working for a ride-share company, accepted a fare.  Tr. 24:3-4.  When L.D.W. arrived at the designated location, no one came.  Tr. 24:5-6.  L.D.W. called the person that ordered the ride and was told "that they would be right out."  Tr. 24:6-9.  Shortly thereafter, a red vehicle pulled up to L.D.W.'s vehicle, so that "the driver's door of [the red] vehicle was next to the driver's door of [L.D.W.'s] vehicle."  Tr. 24:13-14.  The driver of the red vehicle, "got out, pointed a handgun at [L.D.W.], hit him in the head with a handgun, and demanded his cell phone, wallet, and the passcode for his cell phone."  Tr. 24:14-17.  L.D.W. surrendered his cell phone and wallet and began running.  Tr. 24:18-22.  One person jumped into the driver's seat of L.D.W.'s vehicle and both vehicles fled the scene.  Tr. 24:22-24.

Law enforcement arrived within minutes.  Tr. 25:17-25.  L.D.W. described the driver of the red vehicle as "a Black male, 17 to 18, wearing a black jacket and that his hair had like twists in it."  Tr. 26:1-6.

**B.  Warrants**

Between October and December 2021, four search warrants were obtained in

3

connection with numerous carjackings and robberies of ride-share drivers in the City of Minneapolis. *See generally* Exs. 3-6. They were: (1) to obtain "[a] biological sample [from Defendant] for DNA analysis . . ."; (2) to search a specified "Cash App" account associated with Defendant's cellular telephone number; (3) for data and records relating to specified cellular telephone number associated with Defendant; and (4) to search a residence located on Sixth Street North in Minneapolis, Minnesota.

### C. Interview of L.D.W. & Photo Line-Up

Sergeant Ligneel testified that Defendant became a person of interest in the investigation in or around November 2021 when "his fingerprint ha[d] been identified on the exterior driver's door handle of [L.D.W.'s] vehicle." Tr. 29:4-11; *see also* Tr. 40:15-21, 41:15-16, 50:11-15.

#### a. Preparation

At the hearing, Sergeant Ligneel described how he obtains photos in preparation for a sequential photo line-up. Sergeant Ligneel testified that he uses a program called "MRAP, which is booking photos from all over the state." Tr. 29:16-17. Sergeant Ligneel entered Defendant's name, and the program retrieved "all of his booking photos." Tr. 29:17-19. Sergeant Ligneel selected the most recent photo and then used the "sequential lineup" function of the program to "generate pictures that are similar to [Defendant]." Tr. 29:19-22; *see* Tr. 50:25-51:2. The program considers features such as "age range, height, weight, hair, facial hair, tattoos," and complexion. Tr. 29:23-30:3; *see* Tr. 51:3-12.

The program automatically produces six results—the target individual and five

additional individuals.  Tr. 30:4-6, 51:13-15.  The program also gives the investigating officer a number of other results—"30 to however many other people"—"that may also fit that description."  Tr. 30:6-8.  This allows the investigating officer the option to swap out and replace the comparator photos.  Tr. 30:9-11; *see* Tr. 51:16-20.  Sergeant Ligneel testified that his goal in creating a photo line-up is to generate something more similar to the target individual, so he will review the photos generated and replace them as necessary "to make sure that the hair is similar, the clothes that they're wearing is similar, . . . if they have any facial hair, the facial hair is similar, complexion is similar, and age."  Tr. 30:12-18.  Sergeant Ligneel did not recall how many photos he swapped out while preparing the line-up in this case.  Tr. 51:21-25, 52:25-53:1.  After Sergeant Ligneel is satisfied with the photos, he prints them out.  Tr. 31:7-9.

In preparation to meet with L.D.W., Sergeant Ligneel then obtained six identical manila folders, "all the tabs were the same on them so there were no different tabs or anything," and "put each of the pictures into their own manila folder."  Tr. 31:11-15; *see also* Tr. 28:18-20, 38:15-39:2; *see generally* Ex. 1 (individual photos).  Sergeant Ligneel "then . . . asked one of [his] coworkers to mix the pictures up so [he] did not know what order they were in."  Tr. 31:15-17; *see also* Tr. 28:20-21.  Sergeant Ligneel explained that he has someone else mix up the pictures so that he does not know the order of the pictures that are being shown to the witness and risk "mak[ing] it seem like [he] know[s] which picture is of the suspect."  Tr. 31:16-32:8.

### b.  Meeting with L.D.W.

Sergeant Ligneel met with L.D.W. at his residence on February 18, 2022, to talk

about what happened and show him the sequential photo line-up.  Tr. 23:5-17; *see* Tr. 26:7-10; *see also generally* Ex. 2.  L.D.W.'s sister was also present when Sergeant Ligneel met with L.D.W.  Tr. 23:21-24.  No other law enforcement officers were present. Tr. 26:19-20.  At the hearing, Sergeant Ligneel testified that L.D.W.'s native language was Somali and his sister "was there to provide any translation of what [L.D.W.] and I were talking about if she needed to translate for me."  Tr. 26:23-27:6; *see* Tr. 42:12-18, 43:5-9.  Sergeant Ligneel additionally testified that he and L.D.W. were "substantially able to understand each other."  Tr. 27:7-9.  The audio recording reflects that there were times in which L.D.W.'s sister stepped in to help facilitate the conversation between L.D.W. and Sergeant Ligneel, particularly with respect to the instructions for the photo line-up procedure.  *See, e.g.*, Ex. 2 at 3:06-23, 9:56-10:02, 10:15-31, 10:53-59, 11:10-15, 11:30-48, 11:58-12:02, 12:13-19, 15:16-17, 16:00-03.  Sergeant Ligneel did not have any concerns over the accuracy of the translation provided by L.D.W.'s sister nor did he have any reason to believe that she did not translate accurately.  Tr. 58:15-21.

Sergeant Ligneel told L.D.W. that "some fingerprints came back on [his] car," and asked him to describe what happened.  Ex. 2 at 1:02-05.  L.D.W. told Sergeant Ligneel a similar account of what he reported to law enforcement on the day of the carjacking and robbery.  Tr. 27:10-15; *see* Ex. 2 at 1:14-4:46.  L.D.W. also told Sergeant Ligneel that he pleaded with the driver of the red vehicle not to shoot him because he had a kid and the driver hit him around five times.  Ex. 2 at 2:49-59, 4:21-26; *see* Tr. 27:16-21. Additionally, L.D.W. said that he was chased for a short period of time and his ATM PIN and the Wi-Fi password for his vehicle were demanded from him.  Ex. 2 at 2:34-44,

20:13-37; Tr. 27:22-28:5.

Sergeant Ligneel testified that the Minneapolis Police Department has a standard practice when showing witnesses photo line-ups. Tr. 28:11-13. Sergeant Ligneel explained that the person administering the photo line-up has to read "a sequential lineup form" to the witness. Tr. 28:14-15. The form has an "administrator" side and a "witness" side. *See generally* Ex. 1 ("Sequential Line-Up Photo Identification Form"); *see also* Tr. 32:22-25, 33:23-17.

The "administrator" side of the form has instructions for administering the photo line-up. It is not shown to the witness being asked to review the photos. Tr. 34:8-10. In this case, Sergeant Ligneel signed the form as the person administering the photo line-up. Tr. 34:2-7; Ex. 1 (administrator side). At the top, the option that the administrator "does" know the identity of the suspect was checked. Ex. 1 (administrator side).

Among other things, the form instructed that "[a] sequential photo lineup must either be presented by an independent administrator . . . (a person who does not know the identity of the suspect) or, if unavailable, a functional equivalent method . . . must be used." Ex. 1 (administrator side); *see* Tr. 48:18-25. The functional equivalent method "means (1) that the administrator cannot see and does not know the order of the photos and (2) that the witness knows the administrator does not know the order." Ex. 1 (administrator side). The form also instructs the administrator to "[a]sk [the] witness to complete [the] witness portion of the form and sign it." Ex. 1 (administrator side). If the witness identifies a photo, the form instructs the administrator to "have the witness sign and date the photo (or photos) selected." Ex. 1 (administrator side). The form also

instructs the administrator to ask the witness how certain the witness is of the identification if one is made. Ex. 1 (administrator side). The form cautions: "On the certainty question, DO NOT request an eyewitness to represent their response in the form of a percentage." Ex. 1 (administrator side).

The "witness" side of the form has instructions to read to the witness before administering the photo line-up. Ex. 1 (witness side). The form requires the administrator to mark off each instruction as it is read. Ex. 1 (witness side). The witness is instructed that: (1) the administrator is "about to show [the witness] a set of photos" and "[t]he person who committed the crime . . . may or may not be included"; (2) the administrator "do[es] not know the order of the photos" when the functional-equivalent method is used; (3) "[e]ven if [the witness] identif[ies] someone during this procedure, [the administrator] will continue to show [the witness] all photos in the series"; (4) the witness should "[k]eep in mind that a photo may be an old one" and "[s]ome things, like hair styles, can be changed and skin colors may look slightly different in photographs"; (5) the witness "should not feel [the witness has] to make an identification," "[i]t is just as important to clear innocent persons as it is to identify involved parties," and "[w]hether or not [the witness] identif[ies] someone, the investigation will continue"; (6) the witness "will see only one photo at a time," the photos "are not in any particular order," and the witness should "[t]ake as much time as [the witness] need[s] to look at each one"; and (7) the witness "should avoid discussing this procedure or the results, particularly with any other potential witness in the case, as this is an ongoing investigation." Ex. 1 (witness side).

8

The form has a space for the witness to initial before viewing the photo line-up to indicate that the witness understands the instructions. Ex. 1 (witness side). After the witness has viewed the photo line-up, there are spaces for the witness to fill in information about, among other things, the number of photos in the line-up, how many times the photo line-up was viewed, whether the witness was able to identify a suspect and if so which photo, and the certainty of the witness's identification. Ex. 1 (witness side). There are also places for the witness to sign and date the form. Ex. 1 (witness side).

Sergeant Ligneel explained to L.D.W. that he had one of his coworkers mix all of the photos up before he came to meet with him. Ex. 2 at 9:46-50. Sergeant Ligneel told L.D.W. that he was going to show him the photos "one at a time" and that he "had to read [L.D.W.] a form." Ex. 2 at 9:52-55, 10:03-06. Sergeant Ligneel then read through the instructions on the witness side of the form to L.D.W., with L.D.W.'s sister explaining the instructions to him in a language other than the English language after each one was read. Ex. 2 at 10:06-12:19; *see* Tr. 34:11-24. During the instructions, Sergeant Ligneel told L.D.W. that he did "know who the suspect is," but reiterated that he did not know the order of the photos. Ex. 2 at 10:33-45. After he finished reading L.D.W. the instructions, Sergeant Ligneel asked L.D.W. to initial the form, indicating he understood the instructions. Ex. 2 at 12:20-27; *see* Ex. 2 ("LW" on witness side); *cf.* Tr. 34:25-11.

Sergeant Ligneel then presented each of the photos to L.D.W. by "handing him the manila folders." Tr. 35:24-36:5, 36:24-37:4. Sergeant Ligneel did not know the order of the photos and could not see which photo L.D.W. was looking at as he viewed the photos.

Tr. 36:6-10. When looking at one photo, L.D.W. pointed his finger at the photo and stated "that is the one," "that is the one," identifying the person in the photo as the driver of the red vehicle, who pulled him out of his vehicle and hit him with the gun. Ex. 2 at 14:33-55; *see* Tr. 37:5-8, 55:10-19. Sergeant Ligneel asked L.D.W. to sign and data the photo. Ex. 2 at 15:13-15. During this exchange, Sergeant Ligneel also told L.D.W. that if he "had more suspects, [he]'d show [L.D.W.] more pictures." Ex. 2 at 15:10-15; *see* Tr. 46:25-47:4. On the recording, L.D.W. can be heard signing the photo. Ex. 2 at 15:19-21; *see* Ex. 1 (signature on photograph "2"); *see also* Tr. 37:9-14. Sergeant Ligneel then asked L.D.W., "on a scale of 1 to 10," where 1 meant L.D.W. "kinda th[ought] it [wa]s" and 10 meant L.D.W. was "absolutely positive that's him," how certain L.D.W. was of the identification. Ex. 2 at 15:51-59. After translation of the question by L.D.W.'s sister, L.D.W. responded "10, 100%." Ex. 2 at 16:00-06; *see* Tr. 37:5-8, 55:10-14. L.D.W. again repeated that the person in the photo was the driver of the red vehicle, who hit him and had a gun. Ex. 2 at 16:10-26. When L.D.W.'s sister asked if the person L.D.W. identified was the one whose fingerprint had been found, Sergeant Ligneel responded that he was not able to answer that question. Ex. 2 at 17:57-18:08.

Sergeant Ligneel testified that L.D.W. identified the person in the photograph labeled "2" as "the drive of the red car and the person that hit him in the head with the handgun—a handgun multiple times and took his cell phone and—his vehicle." Tr. 36:17-21; *see* Ex. 1 (signature on photograph "2"). The photo labeled "2" was Defendant's photo. Tr. 36:22-23; Ex. 1 ("6up Subject Lineup"). On cross-examination,

Sergeant Ligneel testified that he forgot to have L.D.W. print and sign his name on the "witness" side of the form.  Tr. 54:5-9; *see generally* Ex. 1 (witness side).  Sergeant Ligneel additionally testified that he completed the "[a]fter viewing" section of the witness side of the form, including but not limited to writing "100%" for the certainty of identification and dating the form.  *See* Tr. 54:2-23; Ex. 1 (witness side).

On cross-examination, Sergeant Ligneel also agreed that the photo line-up took place approximately five months after L.D.W. was carjacked and robbed.  Tr. 41:4-5.  Sergeant Ligneel testified that, prior to meeting with L.D.W. in February, he had tried to talk to him, but L.D.W.'s sister "told [him] that [L.D.W.] was extremely traumatized by this and she would tell him that [Sergeant Ligneel] called."  Tr. 42:6-11.  Sergeant Ligneel agreed that there were Somali-speaking officers in the Minneapolis Police Department and he did not have one of those officers accompany him or hire an interpreter when he went to speak with L.D.W.  Tr. 42:19-43:4.  Sergeant Ligneel testified that there was no one available to come with to serve as an independent administrator when he went to meet with L.D.W.  Tr. 49:11-17, 50:2-5, 50:19-20, 59:19-60:10.  On redirect, Sergeant Ligneel explained that the resources of the Minneapolis Police Department over the last year were "[e]xtremely slim" and there were only five other officers in the robbery unit.  Tr. 58:2-9.  Sergeant Ligneel agreed that the preference was for an independent administrator, but that he followed the functional-equivalent procedure.  Tr. 58:13-15, 59:2-8.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned Magistrate Judge makes the following conclusions of law.

### A. Search Warrants

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Flores-Lagonas*, 993 F.3d 550, 559 (8th Cir. 2021) (quoting U.S. Const. amend. IV). "[E]vidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). Defendant asserts that the four search warrants were not supported by probable cause. *See* Tr. 10:6-15, 11:9-17, 12:2-7, 17-22.

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend IV; *see, e.g.*, *United States v. Mayweather*, 993 F.3d 1035, 1040 (8th Cir. 2021) ("The Fourth Amendment requires that warrants to search be supported by probable cause."). "A supporting affidavit establishes probable cause to issue a search warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quotation omitted); *see United States v. Skarda*, 845 F.3d 370, 376 (8th Cir. 2016) ("A showing of probable cause requires evidence of a nexus between the contraband and the place to be searched." (quotation omitted)); *see also Illinois v.*

12

*Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

"The court must make a 'common-sense decision' based on the totality of the circumstances set forth in the affidavit as to whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Skarda*, 845 F.3d at 376 (quoting *Gates*, 462 U.S. at 238); *see United States v. Davis*, 867 F.3d 1021, 1027 (8th Cir. 2017) ("The determination of whether or not probable cause exists to issue a search warrant is to be based upon a common-sense reading of the entire affidavit." (quotation omitted)). "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, . . . [the Eighth Circuit Court of Appeals has] also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *Brackett*, 846 F.3d at 992 (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)); *accord United States v. Augard*, 954 F.3d 1090, 1094 (8th Cir. 2020). "Factors to consider in determining whether a warrant application sufficiently links the items to be seized with the place to be searched include 'the nature of the crime and the reasonable, logical likelihood of finding useful evidence.'" *United States v. Roberts*, 975 F.3d 709, 713 (8th Cir. 2020) (quoting *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017)).

"When an issuing court relies solely on an affidavit to determine whether probable

cause exists, th[e reviewing] court only looks to the information found within the four corners of the affidavit." *United States v. Evans*, 4 F.4th 633, 636 (8th Cir. 2021) (quotation omitted). "Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference." *United States v. Willis*, No. 11-cr-13 (DSD/JJK), 2011 WL 1100127, at *2 (D. Minn. Mar. 14, 2011), *report and recommendation adopted*, 2011 WL 1060981 (D. Minn. Mar. 23, 2011); *see also, e.g.*, *Evans*, 4 F.4th at 636; *Mayweather*, 993 F.3d at 1041; *United States v. Daigle*, 947 F.3d 1076, 1081 (8th Cir. 2020); *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016).

For ease of discussion, the Court will address the warrants in chronological order of issuance.

### 1. House Warrant

Law enforcement applied for the House Warrant following pursuit of stolen vehicle and after setting up a perimeter around a residence on Sixth Street North in Minneapolis, Minnesota. *See generally* House Warrant App. The House Warrant authorized law enforcement to search the residence for "[g]uns, ammo, or gun accessories"; "[c]ell phones and clothings [sic] worn by suspects"; "[c]ar keys or any items related to the victim"; and "[d]ocuments, receipts, mailings or paperwork with names, dates or phone numbers." House Warrant at 1.

The application in support of the House Warrant explained that a ride-share driver called law enforcement around 9:00 p.m. to report that his vehicle (with an identified license plate) had been carjacked at gunpoint. House Warrant App. at 1. Approximately

an hour and a half later, the ride-share driver "called [law enforcement] back to inform [them] that he [w]as tracking his vehicle via a phone that he believed was still inside his stolen vehicle." House Warrant App. at 1. Law enforcement was able to locate the vehicle "and attempted to stop [it]." House Warrant App. at 1-2. "A pursuit ensued" and "[t]he vehicle was eventually stopped in an alley," where law enforcement then observed three occupants exit the vehicle and run into the house on Sixth Street North. House Warrant App. at 2. Law enforcement "set up a perimeter around the [house] and several occupants were called out of the house." House Warrant App. at 2.

The application explained that law enforcement was seeking authorization to enter and search the residence to: (1) "identify the possible suspect inside"; (2) look "for the gun used in the car jacking [sic] along with any other guns, ammo, or gun accessories"; (3) "recover or document clothing found in the house that might match video from squads on scene which might have captured footage of the suspects fleeing into the house"; (4) "recover any items relating to the victim such as their car keys and cell phone"; (5) "recover further cell phones that might locate the suspects at the crime scene"; and (6) "document occupancy of the house including receipts, mailing or paperwork with names, dates, and phone numbers." House Warrant App. at 2.

The application in support of the House Warrant set forth sufficient facts establishing a nexus between the residence on Sixth Street North and the carjacking crime. The carjacking occurred just a few hours before, law enforcement was able to locate the stolen vehicle using tracking data provided by the driver, and, after the stolen vehicle was stopped by law enforcement, the occupants of the stolen vehicle exited the

15

vehicle and fled into the house. Under the totality of the circumstances, the Court concludes that the application established a fair probability that evidence of criminal activity, such as the firearm used in the carjacking, and individuals who may have been involved the carjacking would be found in the house, and therefore established probable cause for the issuance of the warrant.

### 2. Cell Phone Warrant

The Cell Phone Warrant authorized the disclosure of certain historical records and data related to a specified cellular telephone number for a period, generally speaking, between July 1 and October 24, 2021, as "evidence which tends to show a crime has been committed" or "that a particular person has committed a crime." Cell Phone Warrant at 1-2.

The application in support of the Cell Phone Warrant explained that an investigation was being conducted into numerous carjackings and robberies of ride-share drivers in the City of Minneapolis, and that more than 40 of these crimes had occurred between July and October 2021. Cell Phone Warrant App. at 1. The application explained that four individuals, including Defendant and two of his co-defendants, had been identified as being involved in these crimes. Cell Phone Warrant App. at 1. The application further explained that these crimes typically begin with a ride being ordered, thereby bringing the targeted ride-share driver to the perpetrators' desired location. Cell Phone Warrant App. at 1.

The application described one robbery of a ride-share driver that occurred on October 23, 2021. Cell Phone Warrant App. at 1. When the ride-share driver arrived at

the location, he was soon approached by two men "who pulled up behind him in a black Jeep Grand Cherokee" with a specified license plate, which was known to law enforcement to be a vehicle that had been previously carjacked from another ride-share driver. Cell Phone Warrant App. at 1. The two men "opened the front door of [the ride-share driver's] vehicle," "pointed handguns at him[,] and demanded his phones and wallet." Cell Phone Warrant App. at 1; *see* Cell Phone Warrant App. at 1-2. The men then fled in the Jeep. Cell Phone Warrant App. at 1; *see* Cell Phone Warrant App. at 1-2.

The application went on to state that, early the next morning, law enforcement observed the Jeep. Cell Phone Warrant App. at 2. The driver of the Jeep "ran from the vehicle and was apprehended by law enforcement." Cell Phone Warrant App. at 2. The driver of the Jeep was identified, had been a person of interest in the investigation, and is a co-defendant in this case. Cell Phone Warrant App. at 2.

The application then described how, four days after the robbery occurred, a jail call was made by a person "identified by [law enforcement] as being involved in the [ride-share] carjacking[s]/robberies" and a co-defendant in this case. Cell Phone Warrant App. at 5. The call was placed to a cellular telephone number associated with Defendant. Cell Phone Warrant App. at 2. During the call, Defendant told the caller that the driver of the Jeep "wanted to drive that Jeep we did some s*** out of." Cell Phone Warrant App. at 5.

The application next detailed law enforcement's investigation into the cellular telephone number. The application noted that one database showed the number to be associated with a person named "Rio Yeon." Cell Phone Warrant App. at 5. The

application stated that Defendant's nickname is "Rio." Cell Phone Warrant App. The application also noted that Defendant had been the victim of a crime in 2020, provided this number to investigators as his cellular telephone number, and investigators had "reached [Defendant] at this . . . number over the course of their investigation." Cell Phone Warrant App. at 5. The application additionally noted that the number had been entered into "Cash App," where it was associated with an account that "several of the victims of the [ride-share] robberies have had money sent from their Cash[]App accounts" to this account. Cell Phone Warrant App. at 5.

The application further explained that, when the driver of the Jeep was subsequently arrested in connection with the October 23 robbery, the driver identified Defendant as the person who ordered the ride "in order to rob [the ride-share driver]." Cell Phone Warrant App. at 6.

The application indicated that the requested information would "assist investigators in gathering evidence which will potentially show [Defendant] was one of the individuals who committed and/or was not present during the [ride-share] robberies and carjackings from July 1, 2021 to October 24, 2021." Cell Phone Warrant App. at 6.

The application for the Cell Phone Warrant set forth sufficient facts articulating a reasonable basis to believe that Defendant was, at minimum, involved in the October 23 robbery and as a possible recipient of stolen funds derived from prior ride-share carjackings and robberies, and establishing a nexus between the subject cellular telephone number and Defendant. Based on the totality of the circumstances, the Court concludes that the application for the Cell Phone Warrant established a fair probability that evidence

18

of criminal activity—namely, whether Defendant's cellular telephone (and therefore Defendant) were present at or near the scene of the ride-share carjackings and robberies occurring between July and October 2021—would be found in the historical records and data associated with that cellular telephone number, and therefore established probable cause for the issuance of the search warrant. *Cf. Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018) (warrant supported by probable cause required for cell-site location information); *United States v. Thompson*, 976 F.3d 815, 822-23 (8th Cir. 2020) (same).

### 3. Cash App Warrant

The Cash App Warrant authorized law enforcement to obtain certain account data for a specified account[2] with Cash App as "evidence which tends to show a crime has been committed or . . . that a particular person has committed a crime" and "the property . . . was used as [a] means of committing a crime." Cash App Warrant at 8.

The application in support of the Cash App Warrant explained that an

---

[2] The Court notes that there appears to be a typographical error in the subject Cash App account name in either the factual portion of the application in support of the Cash App Warrant or on the face of the application, the warrant itself, and the receipt, inventory and return. As set forth in the factual portion of the application, the subject Cash App account has a "G" between the "D" and the "0." Cash App Warrant App. at 4, 5. This "G" is omitted, however, from the account name on the face of the application, the warrant itself, and the receipt, inventory and return. Cash App Warrant App. at 1; Cash App Warrant at 7; Cash App Receipt, Inventory and Return at 1.

Neither party has addressed this discrepancy and, at the hearing, Defendant confirmed he was seeking a four-corners review of probable cause. Tr. 11:9-17. There has been no particularity challenge to the place to be searched. "Innocent mistakes or negligence alone are insufficient to void a warrant." *United States v. Palega*, 556 F.3d 709, 714 (8th Cir. 2009). "[I]t is sufficient that the description of the premises in the warrant is such that the officer can, with reasonable effort, ascertain and identify the place intended, and avoid mistakenly searching the wrong premises." *Id.* at 713.

In any event, "[t]he exclusionary rule does not apply 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'" *United States v. Saddler*, 19 F.4th 1035, 1040 (8th Cir. 2021) (quoting *United States v. Leon*, 468 U.S. 897, 920 (1984)). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization." *United States v. Norey*, 31 F.4th 631, 635 (8th Cir. 2022) (quotation omitted). It cannot be said that the application in support of the Cash App Warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" or "so facially deficient -- i.e., in failing to particularize the place to be searched or the things to be seized -- that the executing officer cannot reasonably presume it to be valid." *Saddler*, 19 F.4th at 1040 (quoting *Leon*, 468 U.S. at 923).

investigation was being conducted into numerous carjackings and robberies of ride-share drivers in Minneapolis, and that more than 40 of these crimes had occurred between July and October 2021.  Cash App Warrant App. at 3-4.  The application explained that a number of individuals, including Defendant and two of his co-defendants, had been identified as being involved in these crimes.  Cash App Warrant App. at 3.  The application explained that, during these crimes, the perpetrators will typically "demand the driver's cellphone(s), wallet, and cash," and "[a] handgun is either put to the driver's head, or they are pistol[-]whipped, assaulted, and in some instances have been shot, as they are being told to unlock their cellphones and to provide the PIN[s] for their credit cards."  Cash App Warrant App. at 4.  "After leaving the robbery and/or carjacking locations, the [perpetrators] will immediately use the victim['s] cellphone, which they have been forced to unlock and remove the passcode, the [sic] [perpetrators] will transfer money from app[s] such as 'Cash App' . . . ."  Cash App Warrant App. at 4.

The application described one such incident in early October, wherein when the victim "arrived at the . . . location[,] a vehicle pulled in front of him and another in the back of his vehicle blocking him in so they could not leave."  Cash App Warrant App. at 4.  "All of the occupants of both vehicles got out and pointed handguns at the victim and told them not to move or 'they would kill him.'"  Cash App Warrant App. at 4.  "The suspects demanded the victim's cell phone, wallet, and their vehicle."  Cash App Warrant App at 4.  "The victim complied and the suspects told him to 'run away,' so he did."  Cash App Warrant App. at 4.  "The victim was [later] notified via email that several transactions were made using their 'Cash App' account," two of which involved the

20

subject Cash App account.  Cash App Warrant App. at 4.

The application also described the jail call towards the end of October placed by one of the co-defendants to Defendant at a certain cellular telephone number and Defendant's comment during the conversation regarding a vehicle that was known to law enforcement to have been carjacked.  Cash App Warrant App. at 5; *see supra* Section III.A.2.  The application explained that this cellular telephone number was "r[u]n in 'Cash App' and came back" associated with the subject Cash App account.  Cash App Warrant App. at 5.

The application explained that information regarding the subject Cash App account was being sought in order "to obtain evidence to identify the suspects who robbed the victim[s] during the listed robberies and/or carjacking[s] between" July and October 2021.  Cash App Warrant App. at 5.

The application for the Cash App Warrant set forth sufficient facts establishing a nexus between the subject Cash App account and the receipt of stolen funds derived from, at minimum, the early October incident.  Based on the totality of the circumstances, the Court concludes that the application in support of the Cash App Warrant established a fair probability that evidence of criminal activity would be found in the account data associated with that Cash App account, and therefore established probable cause for the issuance of the search warrant.

### 4.  DNA Warrant

As stated above, the DNA Warrant sought "[a] biological sample [from Defendant] for DNA analysis" for purposes of obtaining "evidence which tends to show a

crime has been committed, or tends to show that a particular person committed a crime." DNA Warrant at 1.

The DNA Warrant was obtained after the House Warrant had been executed. *See supra* Section III.A.1. Among other things, the application in support of the DNA Warrant identified Defendant as one of several suspects in the numerous ride-share carjackings and robberies that took place in Minneapolis between July and October 2021. DNA Warrant App. at 2. The application explained that a search warrant had been executed at the house on Sixth Street North in connection with the investigation of the ride-share carjackings and robberies. DNA Warrant App. at 3. The application noted that Defendant was present at the house during the execution of the search warrant. DNA Warrant App. at 3. The application further explained that law enforcement "recovered 6 handguns and . . . a number of carjacked [ride-share] vehicles around the residence." DNA Warrant App. at 3.

The application then stated that a check of Defendant's criminal history showed that he had two prior "felony[-]level convictions, which would prohibit him from possessing firearms and/or ammunition." DNA Warrant App. at 3. The application sought "[Defendant's] DNA in order to compare it to the DNA taken from the firearms recovered from the [House Warrant] . . . as well as the DNA swabs taken from the various [ride-share] carjacked vehicles from July of 2021 to October of 2021 that [Defendant] is believed to be involved in." DNA Warrant App. at 3.

The application for the DNA Warrant set forth sufficient facts establishing a nexus between Defendant and the firearms and carjacked vehicles recovered in connection with

the House Warrant. Based on the totality of the circumstances, the Court concludes that the application in support of the DNA Warrant established a fair probability that evidence of criminal activity—namely, unlawful possession of firearms and carjacking—would be found, and therefore established probable cause for the issuance of the search warrant.

## B. Identification

Defendant moves for suppression of L.D.W.'s eyewitness identification. "The Due Process Clause protects against the admission of evidence derived from improper identification procedures." *United States v. Whitewater*, 879 F.3d 289, 291 (8th Cir. 2018) (citing *Neil v. Biggers*, 409 U.S. 188, 196 (1972)). "The Due Process Clause requires suppression of an eyewitness identification 'only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.'" *United States v. Scott*, 831 F.3d 1027, 1033 (8th Cir. 2016) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012)). Even then, suppression is not automatic. *Id.*; *see also Perry*, 565 U.S. at 239 ("Even when the police use such a procedure, . . . suppression of the resulting identification is not the inevitable consequence."). "Suppression will follow only where the evidence is unreliable." *Scott*, 831 F.3d at 1033.

Accordingly, courts "first determine whether the defendant has shown that the identification procedures were impermissibly suggestive." *Whitewater*, 879 F.3d at 291 (quotation omitted); *see, e.g.*, *United States v. Gilbert*, 721 F.3d 1000, 1006 (8th Cir. 2013); *United States v. Harris*, 636 F.3d 1023, 1026 (8th Cir. 2011). "Only if the photographic lineup was impermissibly suggestive must [courts] proceed to analyze, under the totality of the circumstances, whether the impermissibly suggestive lineup

23

created a likelihood of misidentification violating due process." *Harris*, 636 F.3d at 1026; *see also Perry*, 565 U.S. at 726 ("The due process check for reliability . . . comes into play only after the defendant establishes improper police conduct.").

Sergeant Ligneel used Defendant's most recent booking photo and the MRAP program to generate a sequential line-up consisting of photos of individuals who share similar physical characteristics with Defendant. *See Whitewater*, 879 F.3d at 292; *Scott*, 831 F.3d at 1033. Each photo depicted an African-American male, approximately 17 to 18 years old, wearing an orange corrections shirt with a brown t-shirt underneath, standing against a grayish background. Three of the photos depicted individuals (including Defendant) with a slightly lighter complexion; one individual had a darker complexion; and two individuals had complexions in between. All of the men had dreadlock hair styles that could be described as "twists." Five of the six men had little to no facial hair; one (not Defendant) had a mustache and goatee. The six photos were all proportional in size to one another and had no identifying information other than a single digit below the photograph. As Sergeant Ligneel testified, these photos were then each placed in their own identical manila folder and the photos mixed up by one of his colleagues so that Sergeant Ligneel did not know the order of the photos. Nor could Sergeant Ligneel see which photo L.D.W. was looking at when he took it out of the manila folder. "When there are no differences in appearance tending to isolate the accused's photograph, the lineup is not impermissibly suggestive." *Whitewater*, 879 F.3d at 292 (quotation omitted).

Defendant argues that the sequential photo line-up was impermissibly suggestive

because, when Sergeant Ligneel first arrived to talk with L.D.W., he told L.D.W. that he was the lead investigator and fingerprints had come back on his vehicle, then "intimated that the suspect was involved in several robberies, and that law enforcement hoped to indict the suspect for several offenses."  Def.'s Mem. in Supp. at 8, ECF No. 118.  According to Defendant, these statements gave L.D.W. "the impression that . . . the suspect in his robbery (and the robberies of others) was included within the array."  Def.'s Mem. in Supp. at 8.  Defendant additionally argues that "once the photo array was complete, Sergeant Ligneel indicated to L.D.W. that his job was done[] because law enforcement did not have photographs of other suspects," giving L.D.W. the impression "that he had selected the 'right' person."  Def.'s Mem. in Supp. at 8.

True, Sergeant Ligneel introduced himself to L.D.W. as the lead investigator in the ride-share robberies and told him at the outset of the interview that some fingerprints had come back on his vehicle.  Sergeant Ligneel also told L.D.W. that he was working with a federal prosecutor to pursue charges against the people he *had* identified, suggesting the participation of those individuals was already known.

When it came time for the sequential photo line-up, Sergeant Ligneel merely told L.D.W. that he was going to show him some photos and then went through the Minneapolis Police Department's witness protocol, specifically informing L.D.W., with the added assistance of L.D.W.'s sister, that the person who committed the crime may or may not be included in the photos he was going to show L.D.W. and that L.D.W. should not feel the need to make an identification.  *See Scott*, 831 F.3d at 1033.  While Sergeant Ligneel was aware of who the suspect was in the investigation, "there is no requirement

25

that [photographic] lineups be administered by officers who are independent from the investigation." *United States v. Boston*, 494 F.3d 660, 666 (8th Cir. 2007).  Although perhaps the better practice may have been for Sergeant Ligneel not to have said that he knew who the suspect was (a comment after which he immediately repeated that he did not know the order of the photos), it requires no logical leap to think that the average person presumes that one or more individuals presented in a line-up is considered by law enforcement to be a suspect in the investigation.  Notwithstanding this comment, there is no evidence in the record that Sergeant Ligneel made any suggestive sounds or gestures to L.D.W., and the sequential photo line-up was administered in such a way that Sergeant Ligneel did not know the order of the photos and could not see which photo L.D.W. was looking at so as to avoid any inadvertent or unconscious suggestion that Defendant was the suspect.

Lastly, Defendant's contention that Sergeant Ligneel implied L.D.W. selected the "right" person by informing him that he had no other photos to show him is more indicative of them having reached the end of the sequential photo line-up than it is feedback on the accuracy of L.D.W.'s identification.  Such an implication is further dispelled by L.D.W.'s sister subsequently asking Sergeant Ligneel whether in fact L.D.W. had selected the right person, a question which Sergeant Ligneel declined to answer consistent with the Minneapolis Police Department's protocol that the administrator "be careful not to provide any feedback to [the] witness on either identification or non-identification."  Ex. 1 (administrator side) (capitalization removed).

In sum, the Court concludes that the sequential photo line-up administered to

L.D.W. by Sergeant Ligneel was not impermissibly suggestive.  Because no improper law enforcement conduct was involved, the Court need not screen L.D.W.'s identification for reliability.  *Perry*, 556 U.S. at 241, 245; *Whitewater*, 879 F.3d at 292.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Eyewitness Identifications, ECF No. 89, be **DENIED**.

2. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (DNA Warrant), ECF No. 91, be **DENIED**.

3. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Cash App Warrant), ECF No. 92, be **DENIED**.

4. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Cell Phone Warrant), ECF No. 93, be **DENIED**.

5. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (House Warrant), ECF No. 94, be **DENIED**.

Date: January__26__, 2023                    _____*s/ Tony N. Leung*_____
                                             Tony N. Leung
                                             United States Magistrate Judge
                                             District of Minnesota

                                             *United States v. Childs-Young*
                                             Case No. 22-cr-76(1) (KMM/TNL)

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.